# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

PAM PIEPER and GARY WALLACE,
individually and on behalf of all others
similarly situated,

        Plaintiff,

    v.

UNITEDHEALTH GROUP
INCORPORATED, UNITEDHEALTHCARE,
INC., UNITEDHEALTHCARE LIFE
INSURANCE COMPANY,
UNITEDHEALTHCARE INSURANCE
COMPANY OF THE RIVER VALLEY,
OPTUM, INC., and OPTUMRX, INC.

        Defendants.

Case No. 0:16-cv-00687 (PAM)

**FIRST AMENDED CLASS ACTION
COMPLAINT**

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................. 1

II.     PARTIES ............................................................................................................ 10

        A.      Plaintiff Pam Pieper .............................................................................. 10

        B.      Plaintiff Gary Wallace ........................................................................... 10

        C.      Defendants ............................................................................................. 10

III.    JURISDICTION AND VENUE ......................................................................... 12

IV.     FACTUAL ALLEGATIONS ............................................................................. 14

        A.      Chronic Hepatitis C ("CHC") ............................................................... 14

        B.      Harvoni .................................................................................................. 16

        C.      Early Treatment of CHC Is the Standard of Care in the Medical Community ..... 18

        D.      Harvoni Is Medically Necessary under the Terms of the UH Policies of Plaintiffs' and Members of the Classes .................................... 19

        E.      Defendants Applied Their Coverage Guidelines to Arbitrarily Deny Coverage for Harvoni Treatment ....................................... 23

        F.      Defendants Unlawfully Denied Coverage for Harvoni Treatment ....... 24

V.      CLASS REPRESENTATIVE ALLEGATIONS ................................................ 25

        A.      Plaintiff Pieper ..................................................................................... 25

        B.      Plaintiff Wallace ................................................................................... 27

VI.     ERISA ALLEGATIONS .................................................................................... 30

VII.    CLASS ACTIONS ALLEGATIONS ................................................................ 31

VIII.   CLAIMS ............................................................................................................. 34

IX.     PRAYER FOR RELIEF .................................................................................... 42

X.      DEMAND FOR JURY TRIAL ......................................................................... 42

## GLOSSARY OF DEFINED TERMS AND
## EXHIBITS ATTACHED TO PLAINTIFF'S COMPLAINT

**Exhibits**

| | |
|---|---|
| Exhibit A: | Plaintiff Pam Pieper's UnitedHealth policy (Redacted to remove personal identification information). |
| Exhibit B: | Plaintiff Gary Wallace's UnitedHealth policy and accompanying insurance card (Redacted to remove personal identification information). |
| Exhibit C: | UnitedHealth's 2015 Harvoni Coverage Guidelines. |
| Exhibit D: | UnitedHealth's 2014 Harvoni Coverage Guidelines. |
| Exhibit E: | UnitedHealth's November 10, 2015 Harvoni coverage denial letter to Ms. Pieper (Redacted to remove personal identification information). |
| Exhibit F: | UnitedHealth's December 28, 2015 letter to Ms. Pieper denying appeal of coverage for treatment with Harvoni (Redacted to remove personal identification information). |
| Exhibit G: | OptumRx's prior authorization form for Harvoni coverage. |
| Exhibit H: | OptumRx's November 9, 2015 letter to Ms. Pieper (Redacted to remove personal identification information). |
| Exhibit I: | OptumRx's November 10, 2015 letter to Ms. Pieper (Redacted to remove personal identification information). |
| Exhibit J: | Mr. Wallace's April 14, 2015 order form for Harvoni, as submitted through Transcript Pharmacy, Inc. (Redacted to remove personal identification information). |
| Exhibit K: | Transcript Pharmacy's April 17, 2015 update, as faxed to Mr. Wallace, regarding the status of his Harvoni order. |
| Exhibit L: | Mr. Wallace's Medication Prior Authorization Request Form submitted to Transcript Pharmacy on April 21, 2015 (Redacted to remove personal identification information). |
| Exhibit M: | UnitedHealth's April 22, 2015 Harvoni coverage denial letter to Mr. Wallace (Redacted to remove personal identification information). |

i

| | |
|---|---|
| Exhibit N: | Mr. Wallace's September 21, 2015 letter to Transcript Pharmacy directing it to appeal the April 22, 2015 denial of coverage for Harvoni. |
| Exhibit O: | May 4, 2015 Referral Form submitted on behalf of Mr. Wallace to the CMC – Center for Liver Disease for fibrosis testing. |
| Exhibit P: | Dr. Andrew S. Delemos's August 8, 2015 letter detailing the results of Mr. Wallace's FibroScan. |
| Exhibit Q: | October 27, 2015 letter referencing the denial of Mr. Wallace's appeal of Defendants' Harvoni coverage decision and requesting reimbursement for Mr. Wallace's FibroScan testing. |

## **Defined Terms in Plaintiff's Complaint**

| | |
|---|---|
| AASLD: | American Association for the Study of Liver Diseases |
| AMA: | American Medical Association |
| CFA: | Consumer Fraud Act Minn. Stat. § 325F.69, *et seq.* |
| CHC: | Chronic Hepatitis C |
| CHC Guidelines: | Applicable guidelines established for the testing, management, and treatment of CHC by the American Association for the Study of Liver Diseases and Infectious Diseases Society of America. |
| Coverage Guidelines: | UnitedHealth's internal criteria for determining which CHC sufferers will be denied coverage for Harvoni treatment.  *See* Exhibits C and D. |
| DAA: | Direct-Acting Antiviral |
| FDA: | United States Food and Drug Administration |
| Finance Committee Report: | STAFF OF S. COMM. ON FINANCE, 114TH CONG., THE PRICE OF SOVALDI AND ITS IMPACT ON THE U.S. HEALTH CARE SYSTEM (Comm. Print 2015), http://www.finance.senate.gov/imo/media/doc/1%20The%20Price %20of%20Sovaldi%20and%20Its%20Impact%20on%20the%20U. S.%20Health%20Care%20System%20(Full%20Report).pdf (detailing the history behind the treatment of CHC) |
| Gilead: | Gilead Sciences, Inc.   The company that distributes Harvoni. |

| | |
|---|---|
| IDSA: | Infectious Diseases Society of America |
| IOM: | Institute of Medicine |
| METAVIR Score: | METAVIR fibrosis score that classifies liver scarring from F0-F4. |
| PBM: | Pharmacy Benefits Manager |
| Pharmasset: | Pharmasset, Inc.  The company that carried out the initial development and FDA approval of Harvoni. |
| Pieper UH Policy: | Ms. Pieper's United Health Policy—Policy Number 430 040 223 |
| Wallace UH Policy: | Mr. Wallace's UnitedHealth Policy—Member ID JD5548762 |
| SVR: | Sustained Virologic Response |
| UH Policies: | Health insurance programs, contracts, plans, and/or policies marketed and/or sold by UnitedHealth. |

Plaintiffs Pam Pieper ("Pieper") and Gary Wallace ("Wallace") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following against Defendants UnitedHealth Group Incorporated ("UnitedHealth Group"), UnitedHealthCare, Inc. ("UnitedHealthCare"), UnitedHealthcare Life Insurance Company ("UnitedHealthcare Life"), UnitedHealthcare Insurance Company of the River Valley ("UHC River Valley") (collectively, "UnitedHealth"), Optum, Inc., and OptumRx, Inc. (collectively, with UnitedHealth, "Defendants") based upon information and belief[1] except as to the allegations pertaining specifically as to each Plaintiff that are based on personal knowledge.

## I.    INTRODUCTION

1.     Plaintiffs bring this class action lawsuit individually and on behalf of similarly situated members of the Classes (defined below) against Defendants for their refusal to pay for Harvoni—a medically necessary treatment that can effectively cure the chronic Hepatitis C ("CHC") of Plaintiffs and members of the Classes.  Defendants wrongfully denied coverage for Harvoni based on a desire to decrease costs and increase profits, in breach of the health insurance contracts Defendants entered into with Plaintiffs and members of the Classes and the implied covenant of good faith and fair dealing and, also, in violation of the Consumer Fraud Act, Minn. Stat. § 325F.69, *et seq.* (the "CFA") and the Employee Retirement and Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA").

2.     UnitedHealth markets and/or sells health insurance programs, contracts, plans, and/or policies (the "UH Policies") to millions of people across the nation.  *See, e.g.*, Exhibits A and B.  Plaintiffs and members of the Classes purchased the UH Policies, entered into binding

---

[1] Plaintiffs' information and belief is based on an investigation (by and through counsel) which included, among other things, a review and analysis of publicly available information, news articles, reports to federal regulators, and additional analysis.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

contracts with one or more Defendants, paid insurance premiums, and relied on Defendants to provide health insurance and prescription drug coverage under the terms set forth in the UH Policies and in good faith.

3.    UnitedHealth Group's subsidiaries administer the UH Policies of Plaintiffs and members of the Classes, and OptumRx, Inc. serves as the pharmacy benefits manager ("PBM") for the UH Policies. *See, e.g.*, Exhibits A and B. Defendants were required to exercise good faith and deal fairly with Plaintiffs and members of the Classes when making coverage decisions and/or administering the UH Policies.

4.    The UH Policies are substantially similar in all material respects and constitute the complete agreement between Defendants and Plaintiffs and members of the Classes.

5.    The UH Policies contain substantially similar definitions of "medically necessary" with differences immaterial to the claims asserted herein. The Pieper UH Policy defines "medically necessary" as

> [A] health care service, supply, or drug provided for the purpose of preventing, evaluating, diagnosing, or treating an illness, injury, condition, disease, or its symptoms, that is determined by us or in consultation with an appropriate medical professional to be:
>
> A.    In accordance with generally accepted standards of medical practice;
>
> B.    Clinically appropriate, in terms of type, frequency, extent, site, and duration, and considered effective for the covered person's illness, injury, condition, disease, or its symptoms;
>
> C.    Not provided mainly for the covered person's convenience or that of the covered person's doctor or other health care provider;
>
> D.    Not furnished solely to promote athletic achievement, a desired lifestyle, or to improve the covered person's environmental or personal comfort; and

2

E.    As cost effective as any established alternative service, supply, or drug that is as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of the covered person's illness, injury, condition, disease, or its symptoms.

*See* Exhibit A at Pages 27-28.  Similarly, the Wallace UH Policy states:

4.3    Benefits will be paid only for a service, procedure, treatment, supply, device, or item, Hospital, medical or otherwise, which is medically necessary. To be medically necessary the service or treatment must meet the following criteria as determined by UnitedHealthcare and, if required by UnitedHealthcare, must be authorized on a prospective and timely basis by UnitedHealthcare:

4.3.1    The service or treatment is consistent with generally accepted principles of medical practice for the diagnosis and treatment of the Member's medical condition; and

4.3.2    The service or treatment is performed in the most cost-effective manner in terms of treatment, method, setting, frequency and intensity, taking into consideration the Member's medical condition.

*See* Exhibit B at Pages 25-26.

6.    The UH Policies' delineations of what expenses, services, and treatments may be deemed "covered" are also substantially similar.  The Pieper UH Policy defines a "covered expense" as one that is "A. Incurred while *you[]* or *your dependent's* insurance is in force under this *policy;* B. Covered by a specific benefit provision of this *policy*; and C. Not excluded anywhere in this *policy.  See* Exhibit A at Page 24 (emphasis in original).  Likewise, the Wallace UH Policy defines a "covered service" as "a service, procedure, treatment, supply, device, or item specified in this Contract for which benefits will be provided when medically necessary." *See* Exhibit B at Page 18.

7.    The scopes of "coverage" for the UH Policies are without material difference as well.  The Pieper Policy defines a "covered person" as "*[Y]ou, your* lawful *spouse* and each

3

*eligible child:* A. Named in the application or enrollment form; or B. Whom *we* agree in writing to add as a *covered person.*"  *See* Exhibit A at Page 24 (emphasis in original).  Similarly, the Wallace UH Policy categorizes "members" as "the Subscriber and any Eligible Dependents who are enrolled in UnitedHealthcare"—with "Eligible Dependents" further defined as the subscriber's legal spouse, children under age 26, and certain older, disabled unmarried children. *See* Exhibit B at Pages 19 and 62.

8.      Defendants' obligations to Plaintiffs and members of the Classes were materially the same.  Plaintiffs and members of the Classes reasonably relied—as Defendants intended—on Defendants' express and implied representations in the UH Policies that they would provide health insurance and prescription drug coverage for medically necessary treatments, and not unreasonably deny coverage in bad faith.

9.      Plaintiffs and members of the Classes suffer from CHC and were covered under the UH Policies.  Further, Harvoni was, and remains, a medically necessary covered treatment for Plaintiffs and members of the Classes under the UH Policies.  Plaintiffs and members of the Classes were prescribed Harvoni by their physicians to treat their CHC but were wrongfully denied coverage by Defendants.  Rather than pay for the cost of Harvoni—a once daily tablet that can effectively cure CHC in eight to twelve weeks with minimal side effects—Defendants uniformly applied internal clinical guidelines (the "Coverage Guidelines")[2] to wrongfully deny Harvoni coverage in breach of the implied and express contractual obligations owed to Plaintiffs and members of the Classes and in breach of applicable state and federal laws—including the CFA and ERISA.

_____

[2] Exhibit C sets out UnitedHealth's Coverage Guidelines for 2015 and Exhibit D sets out UnitedHealth's Coverage Guidelines for 2014 (collectively, the "Coverage Guidelines").

10.     The New York State Attorney General is investigating several insurers and issued subpoenas demanding information about their policies for covering Harvoni.  According to a March 2, 2016 report in *The Wall Street Journal*, "[t]he [Attorney General's Harvoni] inquiry centers on whether the firms are engaging in ***misleading and deceptive practices***, because the law requires accurate disclosure of what they cover and consider medically necessary. . . ."[3]

11.     Hepatitis C is a contagious blood-borne virus that attacks the liver and affects millions of people in the United States.[4]  There is an acute form and a chronic form of Hepatitis C; CHC leads to an increase in mortality.[5]  Approximately 75% to 85% of people who are infected with Hepatitis C are chronic carriers, and, until recent scientific breakthroughs, required extensive treatment of the chronic illness.[6]  There are seven separate genotypes of the CHC virus; genotypes 1, 2, and 3 are the most prevalent in the United States.[7]

12.     CHC can lead to a host of medical problems that shorten life expectancy.[8]  For example, CHC patients are at an increased risk of developing advanced scarring of the liver— cirrhosis—which causes reduced liver function and is a life-threatening condition.[9]  CHC patients are also at an increased risk of developing liver cancer, which has one of the highest mortality rates of any cancer.[10]  Prior to experiencing irreversible liver damage, CHC sufferers

---

[3] Corinne Ramey, *Insurers Probed on Hepatitis C Drug Coverage*, THE WALL STREET JOURNAL (Mar. 2, 2016) (emphasis added), http://www.wsj.com/articles/insurers-probed-on-hepatitis-c-drug-coverage-1456965087.

[4] Eric Chak, *et al.*, *Hepatitis C Virus Infection in USA: An Estimate of True Prevalence,* 31 LIVER INT'L 1090, 1090-1101 (Sept. 2011), http://onlinelibrary.wiley.com/doi/10.1111/j.1478-3231.2011.02494.x/epdf.

[5] Stephen L. Chen and Timothy R. Morgan, *The Natural History of Hepatitis C Virus (HCV) Infection*, INT J MED SCI 2006, 47-52, http://www.medsci.org/v03p0047.htm.

[6] *See id.*

[7] Donald G. Murphy, *et al.*, *Hepatitis C Virus Genotype 7, a New Genotype Originating from Central Africa,* 53 J. CLINICAL MICROBIOLOGY 967, 967–72 (Mar. 2015)*,* http://www.ncbi.nlm.nih.gov/pubmed/25520447.

[8] *See* Chen and Morgan, *supra* at n.5.

[9] *See id.*

[10] *See id.*

may experience, among other things, a high risk of heart attack, fatigue, depression, arthritis, fever, itchy skin and jaundice.[11]

13.    Before recent drug developments, individuals with CHC often underwent extensive treatment regimens lasting twenty-four or forty-eight weeks and consisting of daily pills and a weekly injection of a drug known as Interferon.[12]  Interferon causes debilitating side effects; the worst of which can be flu like symptoms lasting throughout the twenty-four or forty-eight week treatment-regimens.[13]  Interferon-treated CHC patients suffer the drug's side effects without any assurance that their Hepatitis C will be cured.[14]  Interferon as a standalone drug has a poor SVR rate and, even in combination with antiviral drugs, the SVR rate is less than 50%.[15]

14.    Within the last five years, pharmaceutical companies have developed direct-acting antiviral ("DAA") drugs for the treatment of CHC that significantly shorten the length of treatment, significantly reduce the side effects, and significantly increase the SVR rate.[16]  These new DAA drugs do not require the use of Interferon to treat CHC, meaning that patients on DAA drugs do not have to suffer debilitating side effects.[17]  Most importantly, the new DAA drugs are capable of ***curing*** CHC after only an eight to twelve week regimen of a once daily tablet.  One of

---

[11] *See id.*

[12] *See* STAFF OF S. COMM. ON FINANCE, 114TH CONG., THE PRICE OF SOVALDI AND ITS IMPACT ON THE U.S. HEALTH CARE SYSTEM (Comm. Print 2015), 8, http://www.finance.senate.gov/imo/media/doc/1%20The%20Price%20of%20Sovaldi%20and%20Its%20Impact%20on%20the%20U.S.%20Health%20Care%20System%20(Full%20Report).pdf (detailing the history behind the treatment of CHC) (hereinafter "Finance Committee Report").

[13] *See id.*

[14] *See id.*  A patient is considered cured of Hepatitis C when a blood test is incapable of detecting the virus twelve or twenty-four weeks after treatment (depending on the treatment) based on the patient's sustained virologic response ("SVR") rate.

[15] *See id.*

[16] *See id.*

[17] *See id.*

these new DAA drugs, Harvoni (ledipasvir-sofosbuvir), developed and distributed by Gilead Sciences, Inc. ("Gilead"), is at the heart of this class action lawsuit.

15.    The United States Food and Drug Administration (the "FDA") approved Harvoni exclusively for the treatment of genotype 1 CHC patients in October of 2014, calling it a "breakthrough" drug.[18]  Harvoni is the first drug approved for the treatment of CHC that does not require combination with other drugs, and can effectively cure CHC in 94% to 100% of cases with little to no side effects.[19]

16.    Notwithstanding the life-saving treatment offered by Harvoni, Defendants limited the access of Plaintiffs and members of the Classes to this miracle drug by developing arbitrary coverage criteria requiring advanced liver scarring for CHC sufferers.  *See* Exhibits C and D. Liver scarring severity is classified by the METAVIR fibrosis score ("METAVIR Score"), which is measured on a scale of F0 to F4.[20]  METAVIR Scores between F0 and F2 represent no liver scarring to light liver scarring whereas METAVIR Scores between F3 and F4 represent severe liver scarring, with F4 representing cirrhosis.[21]  Defendants' Coverage Guidelines covered Harvoni treatment only for patients who had a METAVIR Score of F3 or F4, or its equivalent. *See* Exhibit C at 1 (detailing Defendants' Coverage Guidelines for covering the payment of Harvoni).  Advanced fibrosis and cirrhosis—as measured by a METAVIR Score of F3 and F4, respectively—can progress to end-stage liver disease and liver failure.[22]

---

[18] *See id.*

[19]  Shara Yurkiewicz, *Harvoni Safe and Effective for Cirrhotic Patients*, MEDPAGE TODAY, May 18, 2015, http://www.medpagetoday.com/MeetingCoverage/DDW/51605?xid=nl_mpt_DHE_2015-05-19&eun=g605133d0r (summarizing a study that demonstrated the effective cure rate of Harvoni).

[20]  Thierry Poynard, *et al.*, *Fibrosis in Patients with Hepatitis C: Detection and Significance: Detection and Significance*, SEMINARS IN LIVER DISEASE, 2000, http://www.medscape.com/viewarticle/410846_2.

[21] *See id.*

[22] *See Cirrhosis*, PUBMED HEALTH, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0022024/.

17.    The Coverage Guidelines were not a part of the UH Policies and were not in accordance with standard medical practice.  Defendants unlawfully applied the Coverage Guidelines to arbitrarily refuse Harvoni coverage for CHC patients who did not have a METAVIR Score of F3 or F4, or its equivalent,[23] in breach of the UH Policies and Defendants' duty of good faith and fair dealing, and in violation of state and federal laws, including the CFA and ERISA.

18.    Defendants' Coverage Guidelines also deviated from the standard of care in the medical community for the treatment of CHC.  Since the development of new DAA drugs to treat CHC, such as Harvoni, the standard of care in the medical community has been to treat CHC as soon as the disease is diagnosed so that patients do not suffer the life-threatening complications associated with fibrosis and cirrhosis.  Accordingly, as early as January 2014, the American Association for the Study of Liver Diseases ("AASLD") and the Infectious Diseases Society of America ("IDSA") have jointly recommended that **all** CHC patients be treated with DAA therapies, regardless of disease progression.  These recommendations were made in guidelines established for the testing, management, and treatment of CHC ("CHC Guidelines").[24] The CHC Guidelines expressly state that: "[t]reatment is recommended for **all** patients with chronic HCV infection, except those with short life expectancies that cannot be remediated by treating HCV, by transplantation, or by other directed therapy."[25]

---

[23] Defendants' METAVIR Score requirement is the major determining factor of whether a patient will receive coverage for Harvoni treatment.  While there are other tests that classify liver scarring, the METAVIR Score is the most common.

[24] *See* AASLD and IDSA, *When and In Whom to Initiate HCV Therapy, Recommendations for Testing, Managing, and Treating Hepatitis C,* http://www.hcvguidelines.org/printpdf/91.

[25] *AASLD and IDSA, When and In Whom to Initiate HCV Therapy, Recommendations for When and in Whom to Initiate Treatment,* http://www.hcvguidelines.org/full-report/when-and-whom-initiate-hcv-therapy (emphasis added).

19.    Plaintiffs and members of the Classes were diagnosed with CHC, prescribed Harvoni by their physicians, and unlawfully denied coverage.  As a result, Plaintiffs and members of the Classes have been damaged by Defendants' unlawful denial of coverage for medically necessary Harvoni treatment.

20.    At the time Defendants created the Coverage Guidelines and denied Plaintiffs and members of the Classes Harvoni coverage, Defendants knew or should have known that the standard of care for the treatment of CHC was treating the illness as soon as the patient was diagnosed.[26]  Defendants' practice of denying coverage for Harvoni treatment for CHC sufferers without a METAVIR score of F3 or higher, or alternative scoring equivalent, was a deceptive trade practice in the course of Defendants' business.  Further, Defendants were aware that their practice of denying Harvoni treatment based on the Coverage Guidelines created a likelihood of confusion or misunderstanding in light of the terms of the UH Policies, including *inter alia*, the definition of medically necessary.

21.    Defendants' wrongful denial of Harvoni coverage also constituted a "fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive trade practice" with the intent that Plaintiffs and members of the Classes would rely thereon in connection with Defendants' sale of the UH Policies and/or provision of health insurance and prescription drug coverage services in violation of the CFA.

22.    As a result of Defendants' unlawful denial of Harvoni coverage in breach of the UH Policies and Defendants' duty of good faith and fair dealing, the CFA and ERISA, Plaintiffs and members of the Classes are entitled to actual damages in an amount to be determined at trial and/or injunctive relief.

---

[26] *See id.*  ("[e]vidence clearly supports treatment in *all* BACK-infected persons . . . .") (emphasis added).

## II.    PARTIES

### A.    Plaintiff Pam Pieper

23.    Plaintiff Pam Pieper is and was, at all relevant times, a citizen of the State of Texas residing in Hillsboro, Texas.    On November 19, 2014, Ms. Pieper purchased a UnitedHealth Group health benefit plan on the individual market.  *See* Exhibit A.

24.    Ms. Pieper was prescribed Harvoni by her treating physician and denied coverage by Defendants.

25.    Ms. Pieper's policy with UnitedHealth was in force at the time coverage for her physician-prescribed treatment with Harvoni was denied by Defendants.

26.    OptumRx is the PBM under Ms. Pieper's policy.

### B.    Plaintiff Gary Wallace

27.    Plaintiff Gary Wallace is and was, at all relevant times, a citizen of the State of South Carolina residing in Fountain Inn, South Carolina.  Mr. Wallace is, and was at all relevant times, enrolled in a UnitedHealth Group health benefit plan through his employer.  *See* Exhibit B.

28.    Mr. Wallace was prescribed Harvoni by his treating physician and denied coverage by Defendants.

29.    Mr. Wallace's policy with UnitedHealth was in force at the time coverage for his physician-prescribed treatment with Harvoni was denied by Defendants.

30.    OptumRx is the PBM under Mr. Wallace's policy.

### C.    Defendants

31.    Defendant UnitedHealth Group is a Delaware corporation with its principal place of business located at 9900 Bren Road East Minnetonka, Minnesota.  UnitedHealth Group is the ultimate parent of the subsidiaries identified below.

32.     UnitedHealthCare is a Delaware corporation with its principal place of business located at 9900 Bren Road East Minnetonka, Minnesota.  UnitedHealthCare is one of two principal subsidiaries of UnitedHealth Group.  UnitedHealthCare is registered to do business in Minnesota.  Its registered office is located at 100 South 5th Street number 1075, Minneapolis, Minnesota.

33.     UnitedHealthcare Life is a Wisconsin corporation with its principal place of business located at 3100 Ams Blvd, Green Bay, Wisconsin.  UnitedHealthcare Life is a subsidiary of UnitedHealth Group.  UnitedHealthcare Life is the underwriter of Ms. Pieper's health insurance plan.

34.     UHC River Valley is a Illinois corporation with its principal place of business located at 1300 River Drive, Suite 200, Moline, Illinois.  UHC River Valley is a subsidiary of UnitedHealth Group.  UHC River Valley is the underwriter of Mr. Wallace's health insurance plan.

35.     Optum, Inc. is a Delaware corporation with its principal place of business located at 2300 Main Street, Irvine, California.  Optum, Inc. is one of UnitedHealth Group's two main subsidiaries.  Optum, Inc. manages the subsidiaries that administer UnitedHealth's pharmacy benefits, including OptumRX, Inc. (collectively, "Optum").

36.     OptumRx, Inc. ("OptumRx") is a Delaware corporation with its principal place of business located at 2300 Main Street, Irvine, California.  OptumRx is a subsidiary of UnitedHealth Group and serves as the PBM for the UH Policies.  OptumRx is registered to do business in Minnesota and its registered office is located at 100 South 5th Street number 1075, Minneapolis, Minnesota.

37.     Optum acts as an agent of UnitedHealth in its role as PBM under the UH Policies. UnitedHealth has the ability to control and exercises control over Optum, and Optum assents to UnitedHealth's control.  UnitedHealth directed Optum to apply the Coverage Guidelines to deny coverage for Harvoni treatment for CHC sufferers without a METAVIR Score of F3 or F4, or its equivalent, and Optum relied on the Coverage Guidelines to deny prescription drug coverage for Harvoni for Plaintiffs and members of the Classes.

## III.    JURISDICTION AND VENUE

38.     This Court has subject matter jurisdiction over all claims in this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this lawsuit has been brought as a class action on behalf of a proposed class in excess of 100 members, the aggregate claims of the Class members exceed $5 million exclusive of interest and costs, and one or more of the members of the Class is a citizen of a different state than one or more Defendants.

39.     This Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1367 and ERISA § 502, 29 U.S.C. § 1132.

40.     This Court has personal jurisdiction over UnitedHealth Group because UnitedHealth Group's principal place of business is in the State of Minnesota and it regularly conducts business in the State of Minnesota, has sufficient minimum contacts with Minnesota, and avails itself of the laws of Minnesota.

41.     This Court has personal jurisdiction over UnitedHealthCare because UnitedHealthCare's principal place of business is in the State of Minnesota and it regularly conducts business in the State of Minnesota, has sufficient minimum contacts with Minnesota, and much of the relevant conduct occurred in Minnesota.

42.     This Court has personal jurisdiction over UnitedHealthcare Life because it is registered to do business in the State of Minnesota, regularly conducts business in the State of

Minnesota, has sufficient minimum contacts with Minnesota, and much of the relevant conduct occurred in Minnesota.

43.    This Court has personal jurisdiction over UHC River Valley because much of the relevant conduct occurred in or emanated from Minnesota.[27]

44.    This Court has personal jurisdiction over Optum, Inc. because it is registered to do business in the State of Minnesota, regularly conducts business in the State of Minnesota, has sufficient minimum contacts with Minnesota, and much of the relevant conduct occurred in Minnesota.

45.    This Court has personal jurisdiction over OptumRx because it is registered to do business in the State of Minnesota, regularly conducts business in the State of Minnesota, has sufficient minimum contacts with Minnesota, and much of the relevant conduct occurred in Minnesota.

46.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the unlawful conduct alleged in this First Amended Complaint occurred in, was directed to, and/or emanated from this District, and because UnitedHealth Group is registered to conduct business in this District and maintains its principal places of business in this District.

47.    Venue is also proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

---

[27] Upon information and belief, UnitedHealth Harvoni Coverage Guidelines—developed in Minnesota—applied to, are were applied by, UHC River Valley as well.

## IV.    FACTUAL ALLEGATIONS

### A.    Chronic Hepatitis C ("CHC")

48.    The Hepatitis C virus is small virus that is enveloped in Ribonucleic acid ("RNA").  The genetic sequence of the virus was first discovered in 1989.  The Hepatitis C virus has a highly variable genome and is classified into multiple genotypes and sub-genotypes.  There are seven different genotypes of the Hepatitis C virus and each genotype has its own sub-genotypes.  There is no single drug that can treat the full spectrum of Hepatitis C virus genotypes and sub-genotypes.  Instead, the FDA has approved drug regimens for specific Hepatitis C genotypes and sub-genotypes.

49.    As described above, CHC can lead to a host of medical problems, including increased mortality.  About 70% of CHC cases in the United States are of genotype 1, and the majority of these cases are of sub-genotypes 1a and 1b.  It is estimated that genotypes 2 and 3 account for 16% and 12% of cases in the United States, respectively.  Genotypes 4, 5 and 6 account for fewer than 4% of cases in the United States.[28]  Genotype 1 is the most difficult to treat.

50.    CHC results in inflammation, scarring, and cirrhosis of the liver and increases the risk of liver cancer.[29]  If left untreated, CHC can cause serious illnesses, including cirrhosis, which can only be alleviated through a liver transplant.[30]  Approximately 20% of CHC carriers

---

[28] *See, e.g.*, Jane P. Messina et al., *Global Distribution and Prevalence of Hepatitis C Virus Genotypes,* 61 Hepatology 77, 77–87 (2015); M. Michele Manos et al., *Distribution of Hepatitis C Virus Genotypes in a Diverse U.S. Integrated Health Care Population,* 84 J. Med. Virology 1744, 1744–1750 (2012), http://www.ncbi.nlm.nih.gov/pubmed/22997077.

[29] Liver cancer has one of the highest mortality rates of any cancer. The relative 5-year survival rate from liver cancer is about 15%.   *See Learn About Cancer, Liver Cancer*, AMERICAN CANCER SOCIETY, http://www.cancer.org/acs/groups/cid/documents/webcontent/003114-pdf.pdf.

[30] *See* Finance Committee Report, *supra* n.11, at 7.

develop cirrhosis, and of those with cirrhosis, up to 20% develop liver cancer.[31]   Cirrhosis is extensive scarring of the liver that degrades liver function and is a life-threatening condition. CHC patients can suffer other health issues including a higher risk of heart attack, fatigue, joint pain, depression, sore muscles, arthritis, and jaundice.[32]   CHC is the leading cause of liver transplants in the United States.[33]

51.   No vaccines have been developed to prevent CHC infection.  Infection prevention and treatment are the sole options for dealing with CHC.  The goal of CHC treatment is to reduce the patient's viral load.  Thus, the effectiveness of any Hepatitis C drug is measured by the reduction in the viral count.  A patient is considered cured of Hepatitis C when a blood test, twelve or twenty-four weeks after treatment, is incapable of detecting the virus.  Being cured is referred to as showing an SVR.

52.    Since the discovery of the existence of CHC, Interferon has been the primary treatment option.  Interferon is a naturally occurring protein that cells secrete when they are attacked by a virus.  Treatment with Interferon has many drawbacks; Interferon treatment requires injections and causes side effects, including flu-like symptoms such as fever, fatigue, muscle aches, and myalgia.  Many patients report suffering flu-like symptoms during the entire course of Interferon treatment, which can last up to a year.  The SVR (or cure) rate for Interferon is low—6% for twenty-four week and 16% forty-eight week regimens.

53.   In 1998, the FDA approved the use of Ribavirin, an anti-viral drug, for use in combination with Interferon to treat CHC.  The Interferon and Ribavirin combination improved the SVR rate for patients but continued to leave millions of patients uncured.  The SVR (or cure)

---

[31] *See id.*

[32] *See* Chen and Morgan, *supra* n.4.

[33] *See id.*

rate for the Interferon and Ribavirin combination treatment is 34% for twenty-four week and 42% for forty-eight week regimens.

54.     After the development of Ribavirin, the next advance was the development of DAA drugs, which work by attacking specific viral proteins within the Hepatitis C virus's RNA. In 2011, the FDA approved two DAAs, boceprevir (brand name Victrelis) and telaprevir (brand name Incivek).  In 2013, the FDA approved two additional DAA's, simprevir (brand name Olysio) and Sovaldi.  The new DAA drugs represented the first time that Hepatitis C patients could be treated with drugs that did not require use of Interferon and the corresponding negative side effects.

55.     The FDA approved the use of Sovaldi without the use of Interferon for the treatment of genotype 2 and genotype 3 CHC patients.  The larger group of CHC sufferers—genotype 1 CHC patients—still required the use of Interferon and ribavirin with Sovaldi. However, in October 2014, the FDA approved Harvoni—the first genotype 1 CHC treatment that did not require the use of Interferon.

**B.    Harvoni**

56.     Gilead, a Delaware company headquartered in Foster City, California, is a biopharmaceutical company that discovers, develops, and commercializes drugs in areas of unmet medical need.  Gilead introduced Sovaldi and Harvoni to the market as effective cures for CHC.

57.     Gilead acquired Sovaldi and Harvoni when it purchased Pharmasset, Inc. ("Pharmasset"), a pharmaceutical company based out of Princeton, New Jersey.  Pharmasset carried out the initial development of the drugs and the process of FDA approval.  Before Pharmasset could bring the drugs to the market, Gilead acquired Pharmasset in January 2012.

58.     The FDA granted breakthrough therapy designation to Sovaldi on October 10, 2013.[34]  Approximately two months later, on December 6, 2013, the FDA approved Sovaldi as a component of a combination antiviral treatment regimen for the treatment of CHC patients with genotypes 1, 2, and 3.[35]  In November 2013, Gilead set the price of a standard twelve-week course of Sovaldi treatment at $84,000.[36]  Almost a year later, on October 10, 2014, the FDA approved Harvoni for the treatment of genotype 1 CHC patients.[37]  Gilead priced the standard twelve-week course of Harvoni treatment at $94,500.[38]

59.     Today, for patients with genotype 1 CHC, the recommended treatment by the AASLD and IDSA is Harvoni.[39]  According to the website HCV Advocate, which compiles data from clinical studies of Harvoni, the duration of Harvoni treatment depends on the patient's viral count and whether the patient has undergone previous CHC treatment.  An eight-week regimen may be used for treatment-naïve patients without cirrhosis and with a viral count of less than 6 million per milliliter of blood.  A twelve-week regimen should be used for treatment-naïve patients with or without cirrhosis and with a viral count higher than 6 million per milliliter of blood, and for treatment-experienced patients without cirrhosis.  For treatment-experienced patients with cirrhosis, the recommended treatment duration is twenty-four weeks.  The recommended dosage is one tablet of Harvoni once daily, which contains 90 mg of ledipasvir

---

[34] FDA breakthrough therapy designation speeds up the process for a drug to be introduced to the market.  *See Food and Drug Administration Safety and Innovation Act (DASIA), Fact Sheet: Breakthrough Therapies*, U.S. Food and Drug Administration, http://www.fda.gov/RegulatoryInformation/Legislation/SignificantAmendmentstotheFDCAct/DASIA/ucm329491.html.

[35] *See* Finance Committee Report, *supra* n.11, at 28.

[36] *See id.* at 62.

[37] *See id.* at 28.

[38] *See id.* at 61-62.

[39] *Initial Treatment of HCV Infection*, AASLD & IDSA, http://www.hcvguidelines.org/full-report/initial-treatment-have-infection.

and 400 mg of sofosbuvir.  The reported SVR rate for Harvoni is 90% or above for all treatment durations, measured twelve weeks post-treatment.

**C.    Early Treatment of CHC Is the Standard of Care in the Medical Community**

60.    On January 29, 2014, the AASLD and the IDSA published the CHC Guidelines for Hepatitis C.  The CHC Guidelines, entitled "*HCV Guidance: Recommendations for Testing, Managing, and Treating Hepatitis C*," provide recommendations for the testing, management, and treatment of Hepatitis C.[40]

61.    Since January 2014, the AASLD and IDSA have recommended the early treatment of Hepatitis C as the standard of care—meaning treatment should begin as soon as the patient is diagnosed with CHC.  On October 22, 2015, the AASLD and IDSA updated their guidelines, stating that no impediments exist to the treatment of CHC patients who do not have advanced liver scarring, including patients who have a METAVIR Score of F0 or F1.[41]  While the AASLD and IDSA had previously prioritized CHC treatment for patients with more advanced liver scarring, that decision was based on outdated logistical impediments—the associations never took the position that the treatment of CHC patients who do not have advanced liver scarring was not medically necessary.[42]

62.    In support of the recommendation of the early treatment of Hepatitis C, the CHC Guidelines cite to studies that demonstrate that CHC patients who are treated at the early stages

---

[40] The CHC Guidelines are available at hcvguidelines.org.

[41] *See* Home, *WHEN AND IN WHOM TO INITIATE HCV THERAPY*, AASLD and IDSA, http://www.hcv guidelines.org/full-report/when-and-whom-initiate-have-therapy.

[42] *See id.*

of their liver disease have statistically significant lower mortality rates.[43]  These studies

demonstrate that patients cured of CHC at an early stage live longer and healthier lives.[44]

**D.    Harvoni Is Medically Necessary under the Terms of the UH Policies of Plaintiffs' and Members of the Classes**

63.    On information and belief, the UH Policies, along with each of the operative

terms discussed herein, are materially similar.  Pursuant to the UH Policies, one or more

Defendants agreed to provide payment for medically necessary covered expenses and/or

services.  *See* Exhibit A at Page 24, Page 27-28 and Exhibit B at Pages 18-19, 25-26, and 62.

64.    Treatment with Harvoni met the definition of a medically necessary covered

expense and/or service under the terms of the UH Policies and Defendants' refusal to cover

Harvoni based on the Coverage Guidelines violated the terms of the UH Policies, Defendants'

implied duty of good faith and fair dealing, the CFA and ERISA.

65.    Under the UH Policies, the person named in the enrollment form is a covered

person.  *See* Exhibit A at Page 24 and Exhibit B at Pages 18-19 and 62.

66.    Further, under the Pieper UH Policy, a covered expense is defined as one that is:

"A. Incurred while *you[]* or *your dependent's* insurance is in force under this *policy;* B. Covered

by a specific benefit provision of this *policy*; and C. Not excluded anywhere in this *policy*."  *See*

Exhibit A at Page 24.   Similarly, the Wallace UH Policy defines a "covered service" as "a

service, procedure, treatment, supply, device, or item specified in this Contract for which

benefits will be provided when medically necessary."  *See* Exhibit B at Page 18.

67.    Moreover, the Pieper UH Policy defines "medically necessary" as

---

[43] *See id.* (citing, *e.g.*, Morgan, *et al.*, *Eradication of hepatitis C virus infection and the development of hepatocellular carcinoma: a meta-analysis of observational studies*, ANN INTERN MED, 2013) (documenting that among CHC sufferers, becoming virus free is associated with a more than 70% reduction in the risk of liver cancer and a 90% reduction in the risk of liver-related mortality and liver transplantation)).

[44] *See id.* (citing to numerous clinical studies that show that curing CHC early leads to "dramatic reductions in all-cause mortality").

[A] health care service, supply, or drug provided for the purpose of preventing, evaluating, diagnosing, or treating an illness, injury, condition, disease, or its symptoms, that is determined by us or in consultation with an appropriate medical professional to be:

> A. In accordance with generally accepted standards of medical practice;
>
> B. Clinically appropriate, in terms of type, frequency, extent, site, and duration, and considered effective for the covered person's illness, injury, condition, disease, or its symptoms;
>
> C. Not provided mainly for the covered person's convenience or that of the covered person's doctor or other health care provider;
>
> D. Not furnished solely to promote athletic achievement, a desired lifestyle, or to improve the covered person's environmental or personal comfort; and
>
> E. As cost effective as any established alternative service, supply, or drug that is as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of the covered person's illness, injury, condition, disease, or its symptoms.

*See* Exhibit A at Pages 27-28. Likewise, the Wallace UH Policy states:

> 4.3 Benefits will be paid only for a service, procedure, treatment, supply, device, or item, Hospital, medical or otherwise, which is medically necessary. To be medically necessary the service or treatment must meet the following criteria as determined by UnitedHealthcare and, if required by UnitedHealthcare, must be authorized on a prospective and timely basis by UnitedHealthcare:
>
> > 4.3.1 The service or treatment is consistent with generally accepted principles of medical practice for the diagnosis and treatment of the Member's medical condition; and
> >
> > 4.3.2 The service or treatment is performed in the most cost-effective manner in terms of treatment, method, setting, frequency and intensity, taking into consideration the Member's medical condition.

*See* Exhibit B at Pages 25-26.

68.    Treatment of CHC with Harvoni for patients with a METAVIR Score of less than F3 is within the standards of acceptable medical practice in the United States.  The American Medical Association ("AMA") defines medical necessity as:

> Health care services or products that a prudent physician would provide to a patient for the purpose of preventing, diagnosing or treating an illness, injury, disease or its symptoms in a manner that is: (a) in accordance with generally accepted standards of medical practice; (b) clinically appropriate in terms of type, frequency, extent, site, and duration; and (c) not primarily for the economic benefit of the health plans and purchasers or for the convenience of the patient, treating physician, or other health care provider.[45]

69.    The AMA further states that "[t]he 'prudent physician' standard of medical necessity ensures that physicians are able to use their expertise and exercise discretion, consistent with good medical care, in determining the medical necessity for care to be provided each individual patient."[46]

70.    The Institute of Medicine ("IOM") has stated that: "[t]he criteria used for medically necessary services or services that conform to medical necessity are medical services that are (1) clinically appropriate for the individual patient, (2) based on the best scientific evidence, taking into account the available hierarchy of medical evidence, and (3) likely to produce incremental health benefits relative to the next best alternative that justify any added cost."[47]  IOM noted that the "criteria are consistent with best practices and supported by legal precedent."[48]

---

[45] *Statement of the American Medical Association to the Institute of Medicine's Committee on Determination of Essential Health Benefits*, (Jan. 14, 2011), https://iom.nationalacademies.org/~/media/8D03963CA EB2445094 7C1AEC0CAECD85.ashx.

[46] *Id.*

[47] John K. Iglehart, *Defining Essential Health Benefits—The View from the IOM Committee*, N. Engl. J. Med. (Oct. 20, 2011), http://www.nejm.org/doi/full/10.1056/NEJMp1109982?viewType=Print.

[48] *Id.*

71.     Further, Defendants had no basis to deny Harvoni treatment based on a requirement of advanced fibrosis because there was no lack of supply of Harvoni and the AASLD expressly states that health insurers should not "prioritize" treatment and recognizes the "need to treat **all**" CHC patients.[49]

72.     Thus, Harvoni treatment for Plaintiffs and the members of the Classes is in accordance with "generally accepted standards of medical practice" and, therefore, meets the definition of "medically necessary" under the UH Policies.

73.     The Pieper UH Policy further states that covered expenses will include any drug prescribed to treat a chronic, disabling, or life threatening illness if:

> A.     The drug has been approved by the United States Food and Drug Administration (USFDA) for at least one indication;
>
> B.     The drug is recognized for treatment of the indication for which the drug is prescribed in:
>
> > 1.     The American Hospital Formulary Service Drug Information;
> >
> > 2.     The United States Pharmacopoeia Drug Information; or
> >
> > 3.     Substantially accepted peer-reviewed medical literature.

Exhibit A at Page 41.

74.     Similarly, under the Wallace UH Policy, "Prescription Drug Products will be covered only for FDA-approved indications or for non-FDA-approved indications if such use is commonly accepted as a standard of care, as indicated by the following official compendia: The American Hospital Formulary Service Drug Information, or the United States Pharmacopoeia Drug Information." *See* Exhibit B at 71.

---

[49] *AASLD Position on Treating Patients with Chronic Hepatitis C Virus*, http://www.aasld.org/aasld-position-treating-patients-chronichcv# sthash.7KlZ3Xqy.dpuf (emphasis added).

75.    As Harvoni treatment is approved by the FDA to treat CHC, it meets the requirements for prescription drug coverage under the UH Policies of Plaintiffs and members of the Classes.  Therefore, Harvoni meets all of the requirements of a medically necessary treatment and covered expense and/or service under the UH Policies and there is nothing in the UH Policies or standard medical practice that requires CHC sufferers' medical conditions to deteriorate to severe fibrosis or cirrhosis in order for their treatment to be considered medically necessary or to qualify as a covered expense and/or service.  Moreover, Defendants cannot cite to any standards of acceptable medical practice in the United States or contractual provision in the UH Policies that allows for artificial restrictions on treatment of CHC, which required the health of Plaintiffs and members of the Classes to deteriorate to an irreversible and irreparable level before they can be treated and cured with Harvoni.

**E.    Defendants Applied Their Coverage Guidelines to Arbitrarily Deny Coverage for Harvoni Treatment.**

76.    On information and belief, Defendants uniformly applied the Coverage Guidelines that were used to make Harvoni coverage decisions across all of Defendants' entities that administer health insurance plans and/or prescription drug programs under the UH Policies.

Despite an established standard of care for treating all CHC sufferers, the Coverage Guidelines provided the following basis for their denial of Harvoni coverage for patients without advanced fibrosis: "[b]ased on current evidence-based guidance from professional specialty societies and physician subject matter experts, UnitedHealthcare will provide benefit coverage in cases of hepatitis C infection when there is documented evidence of stage 3 or stage 4 hepatic fibrosis."  Exhibit D.

77.    The Coverage Guidelines cited to the IDSA and AASLD prioritization of treatment with DAAs for those patients with advanced fibrosis (METAVIR F3) as a basis for the

standards established in the guidelines. *See id.* However, as detailed herein, the IDSA and AASLD have recommended early treatment of CHC since January 2014 and never stated that the treatment of CHC patients who do not have advanced liver scarring was not medically necessary.

**F.   Defendants Unlawfully Denied Coverage for Harvoni Treatment**

78.   Defendants applied the Coverage Guidelines to artificially restrict treatment of CHC patients with Harvoni to individuals with F3 or F4 stage liver fibrosis and unlawfully denied coverage to all other CHC sufferers—a practice that was inconsistent with and in breach of the express and implied obligations in the UH Policies of Plaintiffs and members of the Classes, the CFA, and ERISA. Defendants applied these Coverage Guidelines as a cost-saving measure without regard to their contractual obligations or the health of the patient.

79.   As a matter of law, Defendants were required to make coverage decisions based on the policy language in the UH Policies and in good faith. Despite the plain language of the UH Policies, Defendants did not apply the contract language to determine whether Harvoni prescribed by a physician was a medically necessary covered expense and/or service. Rather, as alleged herein, Defendants relied upon their internal Coverage Guidelines—which were not in the contracts of Plaintiffs and members of the Classes—to arbitrarily deny Plaintiffs and members of the Classes coverage for treatment with Harvoni. This practice breached the terms of the UH Policies and Defendants' duty of good faith and fair dealing and injured Plaintiffs and members of the Classes by denying them a potentially life-saving medication and cure for CHC.

80.   Defendants' reliance on the Coverage Guidelines to wrongfully deny coverage for Harvoni treatment also violated the CFA and ERISA.

## V.    CLASS REPRESENTATIVE ALLEGATIONS

### A.    Plaintiff Pieper

81.    Effective January 1, 2015, Ms. Pieper enrolled in one of the UH Policies—Policy Number 430 040 223 (the "Pieper UH Policy")—and paid a monthly premium of $794.99 in exchange for health insurance coverage from UnitedHealth.  *See* Exhibit A at Page 12.  Under the Pieper UH Policy, Ms. Pieper's prescription drug program was administered by OptumRX. *See* Exhibit A at Page 6; Exhibit E.

82.    The Pieper UH Policy, consistent with all of the UH Policies of members of the Classes, provided coverage for medically necessary covered expenses and/or services—the only coverage criteria disclosed to Plaintiffs and members of the Classes in the UH Policies.

83.    Ms. Pieper has been diagnosed with and suffers from CHC.  Ms. Pieper's treating physician, Dr. Adil Habib, prescribed Harvoni as the appropriate treatment and cure for Ms. Pieper's CHC.  Dr. Habib is an American Board of Internal Medicine certified gastroenterologist and hepatologist at The Liver Institute at Methodist Dallas in Dallas, Texas.

84.    On November 9, 2015, OptumRx, the PBM listed in Ms. Pieper's UH Policy, received a Harvoni prior authorization form from Ms. Pieper and Dr. Habib.  *See* Exhibit H.  The prior authorization form requires a prescribing doctor to provide a patient's medical information, including documentation of the "Member's HCV genotype," "Pre-treatment HCV RNA level," "HCV reinfection following liver transplantation," and whether the "Member has cirrhosis." Exhibit G.

85.    On November 9, 2015, OptumRx sent Ms. Pieper a letter stating that OptumRx could not fill her prescription for Harvoni because they did not receive the information required to provide Harvoni to Ms. Pieper under the Coverage Guidelines.  *See* Exhibit H.  According to the letter, Ms. Pieper was required to "[s]ubmi[t] [] medical records documenting stage 3 hepatic

fibrosis" using, among other things, a "[l]iver biopsy confirming a METAVIR score of F3, or alternative scoring equivalent."  *Id.*

86.     On November 10, 2015, OptumRx sent Ms. Pieper a letter identical to its November 9, 2015 letter.  *Compare* Exhibit H *with* Exhibit I.  That same day, UnitedHealth sent Ms. Pieper a letter denying coverage for Harvoni using nearly identical language—stating Harvoni is covered only in cases where liver scarring "has reached the equivalent of a stage 3 METAVIR score or higher."  Exhibit E.

87.     Thus, applying the Coverage Guidelines—rather than the terms of the UH Policies—Defendants arbitrarily determined that Ms. Pieper had not shown severe enough liver fibrosis to be treated with Harvoni and cured of CHC.  *Compare* Exhibits C and D (setting out Coverage Guidelines) *with* Exhibit E (denying coverage).

88.     Prior to December 14, 2015, Ms. Pieper's physician, Dr. Habib, appealed Defendants' November 10, 2015 denial of coverage for Harvoni.  Dr. Habib sent Defendants all of the necessary information regarding Ms. Pieper's CHC diagnosis along with an appeal of the denial and another prescription for Harvoni treatment for Plaintiff.  *See* Exhibit F.

89.     On December 28, 2015, Defendants replied to Dr. Habib's appeal, informing Ms. Pieper that "no benefits are available" because she "does not meet the criteria."  *Id.*  Specifically, Defendants denied Ms. Pieper's appeal for Harvoni coverage and refused to fill her prescription because she did not show "stage 3 or 4 hepatic fibrosis" as evidenced by a "[l]iver biopsy confirming a METAVIR score of F3 or F4, or alternative scoring equivalent. . . ."  *Id.* Defendants' denial of Dr. Habib's appeal filed on behalf of Ms. Pieper was the final step in the administrative appeal process under the Pieper UH Policy.

90.     As a result of Defendants' wrongful refusal to fill Ms. Pieper's Harvoni prescription, Ms. Pieper is not taking any medication to treat her CHC and has been wrongfully deprived of treatment for her CHC.  Further, Ms. Pieper is no longer enrolled in a UH Policy and is currently without insurance.

91.     According to Defendants, "[u]nder current UHC Guidelines, which were developed after the review of the current peer reviewed medical literature, Harvoni is to be covered for the treatment of genotype 1 HCV [CHC] infection only if the patient meets certain-guideline requirements," including advanced fibrosis as indicated by a METAVIR Score of F3 or higher.  *Id.*

### B.     Plaintiff Wallace

92.     Through his employer, Net3 Technology, Mr. Wallace is currently enrolled in one of the UH Policies—Member ID JD5548762 (the "Wallace UH Policy")—and pays a premium in exchange for health insurance coverage from UHC River Valley.  *See* Exhibit B.

93.     The Wallace UH Policy, consistent with the UH Policies of Ms. Pieper and all other members of the Classes, provides coverage for medically necessary covered expenses and/or services—the only coverage criteria disclosed to Plaintiffs and members of the Classes in the UH Policies.

94.     Mr. Wallace has been diagnosed with and suffers from CHC.  Mr. Wallace's treating physician, Dr. Einar Lurix, prescribed Harvoni as the appropriate treatment and cure for Mr. Wallace's CHC.  Dr. Lurix is board certified in Internal Medicine and Gastroenterology and works at Gastroenterology Consultants – Internal Medicine Associates, Greenville Health System, in Greenville, South Carolina.

95.     On April 14, 2015, Dr. Lurix submitted an order for Harvoni on behalf of Mr. Wallace to Transcript Pharmacy, Inc. ("Transcript Pharmacy"), located at 2506 Lakeland Drive,

Suite 201, Jackson, Mississippi. *See* Exhibit J. The order included, among other things, a FIBRO*Spect* II report prepared by Prometheus Therapeutics & Diagnostics evidencing Mr. Wallace's METAVIR score of F0-F1. *See id.*

96.     On April 17, 2015, Transcript Pharmacy faxed an update to Dr. Lurix regarding the status of Mr. Wallace's Harvoni order. *See* Exhibit K. The update stated the following: "Commercial Optum Rx (UHC), the patient's insurance company, is requiring a Prior Authorization on GARY WALLACE. Please carefully review and complete the attached form and fax it to me with the prescriber's signature at 601-420-4040. I will promptly forward the completed forms to the payor and be best able to followup [sic] with them on the approval process with signed copies on site here." *See id.*

97.     On April 21, 2015, Dr. Lurix submitted a completed Medication Prior Authorization Request Form on behalf of Mr. Wallace to Transcript Pharmacy. *See* Exhibit L.

98.     On April 22, 2015, however, Defendants sent Mr. Wallace a letter denying his request for coverage for Harvoni because he "did not meet the conditions necessary for coverage." *See* Exhibit M. According to the letter, Mr. Wallace was required to "[s]ubmi[t] [] medical records documenting stage 3 hepatic fibrosis" using, among other things, a "[l]iver biopsy confirming a METAVIR score of F3, or alternative scoring equivalent." *See id.*

99.     Thus, applying the Coverage Guidelines—rather than the terms of the UH Policies—Defendants arbitrarily determined that Mr. Wallace had not shown severe enough liver fibrosis to be treated with Harvoni and cured of CHC. *Compare* Exhibits C and D (setting out Coverage Guidelines) *with* Exhibit M (denying coverage).

100.    On September 21, 2015, Mr. Wallace's physician, Dr. Lurix, directed Transcript Pharmacy to submit an appeal of Defendants' April 22, 2015 denial of coverage for Harvoni. *See* Exhibit N.

101.    Prior to the appeal, on May 4, 2015, Dr. Lurix submitted a Referral Form on behalf of Mr. Wallace to the CMC – Center for Liver Disease for additional fibrosis testing. *See* Exhibit O.

102.    Mr. Wallace then met with Dr. Andrew S. Delemos at the CMC Hepatology Clinic for a vibration-controlled transient elastography exam. *See* Exhibit P. The result of Mr. Wallace's FibroScan, as explained by Dr. Delemos in a letter to Dr. Lurix on August 8, 2015, showed a "score [of] 6.1 kPa with an IQR of 15%"—which "would be associated with F0 to F1 disease in a patient with chronic hepatitis C." *See id.*

103.    Indeed, in the September 21, 2015 letter directing Transcript Pharmacy to appeal Defendants' denial of Harvoni coverage, Dr. Lurix noted that "[p]atient has completed fibroscan . . ." *See* Exhibit N.

104.    Defendants later rejected Mr. Wallace's appeal and upheld their denial of coverage for his treatment with Harvoni. *See* Exhibit Q. Defendants' denial of Mr. Wallace's appeal was the final step in the administrative appeal process under the Wallace UH Policy.

* * *

105.    Defendants' arbitrary requirement for CHC sufferers to experience severe fibrosis, indicated by a METAVIR Score of F3 or higher, or its equivalent, before providing coverage for Harvoni treatment violated the rights of Plaintiffs and members of the Classes to receive medically necessary treatment under the terms of the UH Policies, and placed artificial restrictions on treatment that were not agreed upon or disclosed in the UH Policies and were not in accordance with the standard of care for the treatment of CHC in the medical community.

106.    Defendants' pattern and practice of denying Harvoni coverage for patients without a METAVIR Score of F3 or higher, or its equivalent, without including that requirement in the UH Policies, was made in breach of their contractual obligations and constituted a "fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive trade practice" in violation of the CFA.

## VI.    ERISA ALLEGATIONS[50]

107.    ERISA mandates that all employee benefit plans establish and maintain reasonable claims procedures; indeed, 29 C.F.R. § 2560.503-(b)(5) requires that "[t]he claims procedures contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants." 29 C.F.R. § 2560.503-l(b)(5).

108.    Further, ERISA limits claims administrators' reliance on internal rules or policies in construing the terms of an employee benefits plan to instances where those rules or policies reasonably interpret the applicable plan pursuant to statutory guidelines.

109.    Defendants have acted, and are acting, as plan administrators by issuing coverage guidelines and making coverage determinations on behalf of ERISA-governed insurance plans; these actions thus give rise to a fiduciary duty on behalf of the ERISA-governed plans that they administer.

110.    As fiduciaries under ERISA, Defendants are legally required to discharge their duties "solely in the interests of the participants and beneficiaries" and for the "exclusive purpose" of providing benefits to participants and their beneficiaries and paying reasonable expenses of administering the plan.

---

[50] These allegations do not apply to Plaintiff Pieper and the non-ERISA class (defined below).

111.    Defendants, however, have inherent conflicts of interest in their administrative roles: every claim they deny increases their profits. As plan administrators with discretionary authority to determine whether insureds are entitled to benefits under their insurance plans and policies, Defendants systematically ignored the treatment recommendations of Plaintiff Wallace's doctor, and used Coverage Guidelines that were inconsistent with the plain language of the Wallace UH Policy to deny Harvoni coverage.

112.    This practice was wholly inconsistent with the terms of the Wallace UH Policy, as well as ERISA, because Defendants' Coverage Guidelines were not based on the medical necessity criteria stated in the Wallace UH Policy. Defendants' implementation of the Coverage Guidelines conflicted with the "broadly protective' purposes of ERISA" and allowed Defendants to re-write plan terms and restrict coverage accordingly. In this way, Defendants breached their fiduciary duties by supplanting the terms of the UH Policies with Coverage Guidelines that allowed them to avoid costs and boost profits by denying coverage for Harvoni.

## VII.    CLASS ACTIONS ALLEGATIONS

113.    Plaintiff Pieper brings this action pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Non-ERISA Class:

> All persons suffering from chronic Hepatitis C who are or were insured by UnitedHealth or its affiliates, subsidiaries, agents or related entities under a plan not governed by ERISA, and were (1) prescribed Harvoni by their treating physician; and (2) denied coverage for Harvoni because they did not have a METAVIR Score of F3 or F4, or its equivalent, by one or more Defendants or their affiliates, subsidiaries, agents or related entities (the "Non-ERISA Class").

114.    Plaintiff Wallace brings this action pursuant to Federal Rule of Civil Procedure 23 on behalf of the following ERISA Class:

> All persons suffering from chronic Hepatitis C who are or were insured by UnitedHealth or its affiliates, subsidiaries, agents or related entities under an ERISA-governed plan, and were (1) prescribed Harvoni by their treating physician; and (2) denied coverage for Harvoni because they did not have a

METAVIR Score of F3 or F4, or its equivalent, by one or more Defendants or their affiliates, subsidiaries, agents or related entities (the "ERISA Class") (together with the Non-ERISA Class, the "Classes").

115.    Excluded from the proposed Classes are Defendants and their affiliates, subsidiaries, agents or related entities, directors, officers and/or employees.  Any judicial officer assigned to this action is also excluded.  Plaintiffs reserve the right to revise the definitions of the Classes based upon subsequently discovered information.

116.    This action is brought and may be properly maintained as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(1), 23(b)(2), and/or 23(b)(3).

117.    The Classes are so numerous that joinder of all members is impracticable. Plaintiff believes that there are thousands of proposed members of the Classes throughout the United States.

118.    Common questions of law and fact exist as to all members of the Classes and predominate over any issues solely affecting individual members of the Classes.  The common questions of law and fact include but are not limited to:

- whether any Defendant was contractually obligated to provide Plaintiffs and members of the Classes with coverage for medically necessary treatment while the UH Policies were in force;

- whether the treatment of CHC with Harvoni qualified as medically necessary under the terms of the UH Policies;

- whether the treatment of CHC with Harvoni qualified as a covered expense and/or service under the terms of the UH Policies;

- whether Harvoni was the standard of care for treating CHC;

- whether any Defendant breached the UH Policies and/or Defendants' implied covenant of good faith and fair dealing by denying Plaintiff and members of the Classes coverage for Harvoni while the UH Policies were in force;

- whether UnitedHealth Group, UnitedHealthCare and/or UHC River Valley violated the Minnesota Uniform Deceptive Trade Practices Act,  Consumer Fraud

32

Act and/or the Employee Retirement and Income Security Act of 1974 by denying Plaintiff and members of the Classes coverage for Harvoni; and

- whether Plaintiffs and members of the Classes are entitled to injunctive relief and/or actual damages for Defendants' violations of contractual and/or statutory obligations.

119.    Plaintiff Pieper's claims are typical of the claims of the Non-ERISA Class and Plaintiff Wallace's claims are typical of the claims of the ERISA Class.  As alleged herein, Plaintiffs and members of the Classes sustained damages arising out of the same course of unlawful conduct by Defendants.

120.    Plaintiffs are willing and prepared to serve the Classes in a representative capacity with all of the obligations and duties material thereto.  Plaintiffs will fairly and adequately protect the interests of the Classes and have no interests adverse to, or which conflict with, the interests of the members.

121.    Plaintiffs' interests are co-extensive with, and not antagonistic to, those of the absent members of the Classes.  Plaintiffs will undertake to represent and protect the interests of the absent members of the Classes.

122.    Plaintiffs have engaged the services of the undersigned counsel.  Counsel is experienced in complex litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiffs and the absent members of the Classes.

123.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiffs know of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

124.    Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only

individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

125.    The Class may also be certified under Rule 23(b)(1)(A) and (B) because the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, would be dispositive of the interests of nonparties to the individual adjudications, and would substantially impair the ability of such nonparties to protect their interests.

126.    The Class may also be certified under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Class, thereby making it appropriate to award final injunctive relief with respect to the Class as a whole.

127.    The interest of Class members in individually controlling the prosecution of separate actions is theoretical and not practical.  The Class has a high degree of similarity and is cohesive.  Plaintiff anticipates no difficulty in the management of this matter as a class action.

## VIII.   CLAIMS

**COUNT I**
**Breach of Contract**
**(Plaintiff Pieper and the Non-ERISA Class v. All Defendants)**

128.    Plaintiff Pieper and Non-ERISA Class members incorporate and re-allege each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

129.    Ms. Pieper and the Non-ERISA Class members entered into the UH Policies with one or more Defendants, through which Ms. Pieper and the Non-ERISA Class members agreed to pay monthly premiums to one or more Defendants in exchange for Defendants' agreement to provide health insurance coverage and prescription drug coverage to Ms. Pieper and Non-ERISA Class members.

130.   Ms. Pieper and Non-ERISA Class members performed their contractual obligations under the UH Policies by paying monthly premiums to one or more Defendants.

131.   Defendants materially breached the terms of Ms. Pieper's and Non-ERISA Class members' UH Policies by, *inter alia*:

(a)    failing to apply the appropriate standard for coverage when evaluating Ms. Pieper's and Non-ERISA Class members' claims for coverage of Harvoni treatment, including the criteria for medically necessary required by the UH Policies;

(b)    arbitrarily applying the Coverage Guidelines to deny coverage for CHC sufferers without a METAVIR Score of F3 or F4, or its equivalent;

(c)    failing to find that treatment with Harvoni was a covered expense and/or service under Ms. Pieper's and Non-ERISA Class members' UH Policies;

(d)    denying coverage to Ms. Pieper and Non-ERISA Class members for Harvoni treatment that was covered by the UH Policies; and

(e)    requiring that Ms. Pieper's and Non-ERISA Class members' health and medical condition deteriorate to F3 or F4 stage liver fibrosis, resulting in irreversible damage and irreparable harm, before providing treatment with Harvoni that was medically necessary under the UH Policies.

132.   On information and belief, Defendants breached the terms and provisions of materially similar UH Policies sold to Ms. Pieper and Non-ERISA Class members by applying the Coverage Guidelines to unlawfully deny coverage for Harvoni, and other presently unknown acts and omissions, which will be proven at trial.

133.   As a direct and proximate result of Defendants' material breaches of their contractual obligations, Ms. Pieper and Non-ERISA Class members were wrongfully denied Harvoni coverage and suffered damages to be proven at trial.

## COUNT II
### Breach of Implied Covenant of Good Faith and Fair Dealing,
### in the Alternative (Plaintiff Pieper and the Non-ERISA Class v. All Defendants)

134.    Plaintiff Pieper and the Non-ERISA Class members incorporate and re-allege each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

135.    An implied covenant of good faith and fair dealing is included in every contract, including the UH Policies.

136.    Defendants have a duty of good faith and fair dealing in their performance of the UH Policies.  The implied covenant requires that Defendants exercise good faith towards Ms. Pieper and the Non-ERISA Class members when making coverage decisions and/or administering the UH Policies and requires Defendants comply with the spirit, not just the letter of the contracts.

137.    By entering into a contractual relationship with Ms. Pieper and the Non-ERISA Class members, Defendants agreed to perform their obligations under the UH Policies in good faith and to deal fairly and not unreasonably deny health insurance and/or prescription drug coverage to Ms. Pieper and the Non-ERISA Class members.

138.    Defendants breached the implied covenant of good faith and fair dealing in the UH Policies by, *inter alia*:

    (a)    unreasonably denying coverage for Ms. Pieper's and the Non-ERISA Class members' claims for Harvoni treatment;

    (b)    arbitrarily applying the Coverage Guidelines to deny coverage for CHC sufferers without a METAVIR Score of F3 or F4, or its equivalent;

    (c)    denying coverage to Ms. Pieper and the Non-ERISA Class members for Harvoni treatment in bad faith based on Defendants' desire to decrease costs and increase profits;

    (d)    unreasonably failing to give due consideration to Ms. Pieper's and the Non-ERISA Class members' health and welfare when considering claims for coverage of Harvoni treatment; and

(e)    requiring that Ms. Pieper's and the Non-ERISA Class members' health and medical condition deteriorate to F3 or F4 stage liver fibrosis, resulting in irreversible damage and irreparable harm, before providing treatment with Harvoni which can effectively cure Ms. Pieper's and the Non-ERISA Class members' CHC.

139.    As a direct and proximate result of Defendants' breaches of the implied covenant of good faith and fair dealing, Ms. Pieper and the Non-ERISA Class members have suffered damages to be proven at trial.

### COUNT III
**Violation of Minnesota's Consumer Fraud Act § 325F.69, *et seq.*
(Plaintiff Pieper and the Non-ERISA Class v.
UnitedHealth Group and UnitedHealthCare)**

140.    Plaintiff Pieper and the Non-ERISA Class members incorporate and re-allege each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

141.    Pursuant to the Private Attorney General Act, Minn. Stat. § 8.31, subd. 3a, any person injured by a violation of the Minnesota Consumer Fraud Act § 325F.69 may bring a civil action.  Minn. Stat. § 8.31, subd. 3a (2003).

142.    Ms. Pieper and the Non-ERISA Class members are persons and consumers under the CFA.  *See* Minn. Stat. § 325F.69.

143.    UnitedHealth Group and UnitedHealthCare are persons under the CFA.  *See* Minn. Stat. § 325F.69, subd. 1.

144.    UnitedHealth Group and UnitedHealthCare marketed and sold the UH Policies with the intent that Ms. Pieper and the Non-ERISA Class members would rely on UnitedHealth Group and UnitedHealthCare to provide health insurance coverage.  Ms. Pieper and the Non-ERISA Class members reasonably relied on UnitedHealth Group and UnitedHealthCare to provide health insurance coverage—pursuant to the terms of the UH Policies—in exchange for the monthly premiums paid by Ms. Pieper and the Non-ERISA Class members.

145.    UnitedHealth Group and UnitedHealthCare's use of the Coverage Guidelines—rather than any contractual provision in the UH Policies—to deny Harvoni coverage to CHC sufferers without a METAVIR Score of F3 or higher, including Ms. Pieper and the Non-ERISA Class members, constituted a "fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive trade practice" in violation of the CFA.

146.    UnitedHealth Group and UnitedHealthCare employed a "fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive trade practice" with the intent that Ms. Pieper and the Non-ERISA Class members would rely thereon in connection with their sale of the UH Policies and their provision of health insurance and prescription drug coverage services in violation of the CFA.

147.    As a direct and proximate result of UnitedHealth Group and UnitedHealthCare's wrongful denial of Harvoni coverage in violation of the CFA, Ms. Pieper and the Non-ERISA Class members suffered harm to their medical condition and health and incurred actual damages to be determined at trial.

148.    As a result of UnitedHealth Group and UnitedHealthCare's wrongful denial of Harvoni coverage in violation of the CFA, Ms. Pieper and the Non-ERISA Class members are entitled to damages, costs of litigation, and attorneys' fees. *See* Minn. Stat. § 8.31; Minn. Stat. § 325F.69.

149.    The public interest will benefit from UnitedHealth Group and UnitedHealthCare being held liable for their CFA violations.  Minn. Stat. § 325F.69.

## COUNT IV
## Claim for Improper Denial of Benefits under ERISA
### (Plaintiff Wallace and the ERISA Class v.
### UnitedHealth Group, UnitedHealthCare, and UHC River Valley)

150.    Plaintiff Wallace and the ERISA Class members incorporate and re-allege each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

151.    Plaintiff Wallace and the ERISA Class members bring this claim for improper denial of benefits pursuant to 29 U.S.C. § 1132(a)(1)(B).

152.    Plaintiff Wallace and the ERISA Class members are covered by insurance plans issued by UnitedHealth Group, UnitedHealthCare, and UHC River Valley.  Pursuant to their plans and applicable federal law,  UnitedHealth Group, UnitedHealthCare, and UHC River Valley are required to cover and approve payment for treatment that is medically necessary, as defined in the Plaintiff Wallace's and the ERISA Class members' UH Policies. Harvoni meets the UH Policies' medical necessity criteria.

153.    UnitedHealth Group, UnitedHealthCare, and UHC River Valley are responsible for administering and making benefit determinations under Plaintiff Wallace's and the ERISA Class members' UH Policies and, also, for developing internal practices and policies directing such determinations. UnitedHealth Group, UnitedHealthCare, and UHC River Valley exercise authority or control over the management of the plans, management of the plan's assets, or disposition of the plans' assets.  Further, UnitedHealth Group, UnitedHealthCare, and UHC River Valley retain the authority to make decisions—and, in fact, do make decisions—regarding claims for benefits and appeals pertaining to same, including the approval of payment and writing of checks for coverage.

154.    UnitedHealth Group, UnitedHealthCare, and UHC River Valley wrongfully denied claims submitted by Plaintiff Wallace and the ERISA Class members in violation of the

terms and conditions of Plaintiff Wallace's and the ERISA Class members' UH Policies and ERISA.

155.    UnitedHealth Group, UnitedHealthCare, and UHC River Valley's improper denials caused harm to the medical condition and health of Plaintiff Wallace and the ERISA Class members.

156.    As a result, under 29 U.S.C. § 1132(a)(3), Plaintiff Wallace and the ERISA Class members have a right to damages, together with attorneys' fees and costs, in an amount to be proven at trial.

**COUNT V**
**Claim for Other Appropriate Equitable Relief under ERISA**
**(Plaintiff Wallace and the ERISA Class v.**
**UnitedHealth Group, UnitedHealthCare, and UHC River Valley)**

157.    Plaintiff Wallace and the ERISA Class members incorporate and re-allege each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

158.    Plaintiff Wallace and the ERISA Class members bring this claim for other appropriate equitable relief under 29 U.S.C. § 1132(a)(3)(B), as relief under Count IV will not make Plaintiff Wallace and the ERISA Class members whole for UnitedHealth Group, UnitedHealthCare, and UHC River Valley's breaches of fiduciary duties through their unlawful application of UH Coverage Guidelines.

159.    UnitedHealth Group, UnitedHealthCare, and UHC River Valley are ERISA fiduciaries within the meaning of 29 U.S.C. §§ 1109(a) and 1002(21)(A) because they are responsible for making benefit determinations under Plaintiff Wallace's and the ERISA Class members' UH Policies and, also, developing internal practices and policies applied in making such determinations.

160.    As stated above, UnitedHealth Group, UnitedHealthCare, and UHC River Valley exercise authority or control over the management of the plans, management of the plan's assets, or disposition of the plans' assets and, additionally, retain the authority to make decisions regarding claims for benefits and appeals pertaining to same.

161.    Accordingly, as ERISA fiduciaries, UnitedHealth Group, UnitedHealthCare, and UHC River Valley owed Plaintiff Wallace and the ERISA Class numerous fiduciary duties, including the duty to make decisions in accordance with plan terms and ERISA requirements.

162.    Notwithstanding    their    fiduciary    obligations,    UnitedHealth    Group, UnitedHealthCare, and UHC River Valley developed and relied on Coverage Guidelines that improperly restricted Harvoni coverage in violation of Plaintiff Wallace's and the ERISA Class members' UH Policies and ERISA requirements. This constituted a violation of UnitedHealth Group, UnitedHealthCare, and UHC River Valley's fiduciary obligations.

163.    Plaintiff Wallace and the ERISA Class have been harmed by these breaches of UnitedHealth Group, UnitedHealthCare, and UHC River Valley's fiduciary duties, insofar as their claims were subjected to unlawful restrictions that were not part of their UH Policies.

164.    By engaging in this misconduct, UnitedHealth Group, UnitedHealthCare, and UHC River Valley were unjustly enriched insofar as they retained premiums paid by Plaintiff Wallace and the ERISA Class members, but chose not to honor their side of the bargain: failing to provide contractually-promised coverage for medically-necessary treatment.

165.    Thus, pursuant to 29 U.S.C. § 1132(a)(3)(B), Plaintiff Wallace and the ERISA Class have a right to restitution, disgorgement, surcharge and other appropriate equitable relief, together with attorneys' fees and costs, in an amount to be proven at trial..

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and members of the Classes, and award the following relief:

A.    that the proposed Non-ERISA and ERISA Classes be certified pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff Pieper as the representative of the Non-ERISA Class, Plaintiff Wallace as the representative of the ERISA Class, and Plaintiffs' counsel as counsel for the Classes;

B.    award Plaintiffs and members of the Classes appropriate relief, including, *inter alia*, actual damages sustained by Plaintiffs and the Classes as the result of Defendants' material breach of the terms of the UH Policies;

C.    order equitable and/or injunctive relief as may be appropriate;

D.    award all costs of prosecuting the litigation, including expert fees and attorneys' fees under Minn. Stat. § 8.31; Minn. Stat. § 325F.69; ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1); and other applicable laws;

E.    award pre- and post-judgment interest; and

F.    grant such additional relief as this Court may deem just and proper.

## X.    DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated: September 12, 2016                    Respectfully submitted,

                                             **CHESTNUT CAMBRONNE**

                                             /s/ *Karl L. Cambronne*
                                             Karl L. Cambronne
                                             kcambronne@chestnutcambronne.com
                                             Bryan L. Bleichner
                                             bbleichner@chestnutcambronne.com
                                             Jeffrey D. Bores
                                             jbores@chestnutcambronne.com
                                             17 Washington Avenue North
                                             Suite 300
                                             Minneapolis, MN 5540
                                             Telephone: (612) 339-7300
                                             Facsimile: (612) 336-2940

**KESSLER TOPAZ
 MELTZER & CHECK, LLP**
Joseph H. Meltzer
jmeltzer@ktmc.com
Edward W. Ciolko
eciolko@ktmc.com
Natalie Lesser
nlesser@ktmc.com
Zachary Arbitman
zarbitman@ktmc.com
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**COOPER & KIRK, PLLC**
David H. Thompson
dthompson@cooperkirk.com
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601

*Attorneys for Plaintiff Pam Pieper, Gary Wallace,
and the proposed Classes*